May it please the Court, Cynthia Hahn appearing for Appellate Rene Blanco. I think the most important thing to look at in this case is that Pedro Rivera, the informant for the DEA, was not just a crucial witness. He was the only witness to everything that took place in this case. As a matter of fact, a companion case, United States v. Alvarez-Farfan, I believe one of the panel members said on that case. Their factual and procedural background, and that's at 338 Fed Third 1043. The factual and procedural background is based solely on Mr. Rivera's testimony. And apparently the Court found that it was not sufficient to reverse, to affirm, excuse me, Alvarez-Farfan's conviction for distribution, because all they had was Pedro Rivera's word on that Mr. Farfan signed the hotel register, and he tried to introduce proof of handwriting that he didn't, and the Court said no. You said yes and reversed his case. Well, my recollection is that that case doesn't get us very far in this one. In that case, our holding was that the jury should have been allowed to look at the handwriting. That's correct. But the only person who said Mr. Farfan had signed the register was Mr. Rivera. Correct. So now we have here a month before the trial began, the government tells the Court that the only thing Mr. Rivera has is a prior shoplifting conviction and received significant funds from the DEA. They never mentioned that Mr. Rivera was also under a special parole visa from the IMS for his work for the DEA. And that didn't actually come out until Agent Barnard was cross-examined. And when it did come out, the Court said, oh, well, that's enough fuel for the cross-examination fire. The jury doesn't need fuel anymore. Well, that's certainly true. Now, let me ask you this. I read the testimony. Yes. And the cross-examination does bring out that he's got some sort of a special arrangement, although the detail remains a little ambiguous with the federal government with respect to his immigration status. And it does bring out, or maybe this is brought out at the end of direct, that he's testified in prior, that he's participated as an informant in about ten prior cases. I think I'm hearing you tell me that his lawyer, were you his lawyer at trial? No, he had a private attorney. I think I'm hearing you tell me that his lawyer did not know until he asked the question on cross-examination about the INS status. Is that right? That is correct. So that was just a pure shot in the dark? Well, when they thought he may be an illegal immigrant, and so they asked the question and Agent Barnard said, well, he's on some kind of special status with the INS. And the government had never said that before? No. So now we have, and there's a long line of cases. Some of the judges on this panel have sat on some of these cases saying the bottom line, that the reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. Is the standard here? How do you judge that? Because we don't have the evidence that wasn't disclosed. And you don't have the evidence that wasn't disclosed. And the judge has never seen the evidence that wasn't disclosed. So how can we tell whether there is anything in the evidence that wasn't disclosed that would have been more exculpatory or better for cross-examination purposes than what came out through good cross-examination? Well, what we do know about Mr. Rivera is that he had done at least ten prior cases with the DEA. We know he has an A file that we've never seen. And there was a case, United States v. Streifler, where the defendants in their appeal acknowledged that they didn't know what would be in there, and it was reversed. As a matter of fact, in that case, it was sent back down for the district court to review in camera the files that were not disclosed. The district court found nothing. It was again appealed to the Ninth Circuit, and the Ninth Circuit found three or four things and sent it back for a new trial. And that's not the first case. So is your proposal that essentially we do that, that we send it back, that we have a in camera – if the government continues to maintain that what is in the file is not exculpatory – in other words, I mean, they could say that, right? They could say, look, you know, what's in the file shows only what came out at trial, that is, that he participated in X number of cases, got X amount of dollars, had special INS status, but there's nothing additional that would have been of any help to the defense? Suppose that was their position when it went back. And then the district court would look at it in camera to confirm that? Is that what would happen? Actually, I'm going to reach for the moon here. I would prefer that the Ninth Circuit take a look at these files, because there's at least two cases out there where the district court did do an in camera review of the files after it being sent back. Well, you can't do that. It's not in the record in any form at all. I beg your pardon? It's not in the record in any form at all, in camera, sealed or otherwise, right? No, it's not. But we know there's an A file. And we know that there's 10 other DEA cases which we were not allowed to go into, or at least Mr. Blanco's attorney at the time – we weren't the attorney for the trial – was not allowed to go into. He did submit a request, and it was turned down. Well, reach for the moon. There's a French expression, sur la lune, on the moon. It means crazy. We're not crazy. I don't know. If it's not in the record at this point, I'm a little reluctant to supplement the record here without letting the district judge have a look at it. Can I pursue Judge Berzon's lines of questioning? I mean, this is a hard case for me because the way Brady ordinarily works is that the prosecutor has an obligation to turn over its sculptory material. Even in the absence of a request by the defense, it's simply an obligation that the prosecutor has. But it ordinarily does not work that the defense gets to say, open up your files so that I can figure out what's in your file that I think is sculptory. It's usually an obligation that the prosecutor is required to comply with. And the way I usually see these cases is somehow the defense has later learned of information that the prosecutor had that should have been turned over. How do we adopt your position, which is to say we think there's some stuff there, but we haven't seen it, short of turning this into a vehicle for automatic, Brady-triggered, open-file discovery of whatever the prosecutor has? Well, this is not your usual informant case where there were agents that saw things. There were 12 to 16 agents on this case that saw absolutely nothing. Every time they went to surveil something, they said, oh, very difficult area to surveil. But isn't the key point that we know something was withheld, which was the immigration stuff, at least? That and DEA. Right. Well, the DEA files, we don't know whether at this point that there was anything in them that was withheld that would have been helpful. But we do know that the immigration information was not provided and would have been helpful. So we at least know that. And the question is, what does that trigger in terms of something? Does that cut off Judge Fletcher's fishing expedition problem such that there's a burden shifts or something changes at this point? Well, the very fact that he was the only person who could testify to any illegalities at all. That's strictly true. I mean, there were tapes of some things and there were. Well, this is not an insufficiency of the evidence test. This is a test of when you have a crucial informant that is the only witness to any illegalities, under Brady, the government must turn over these cases or the DEA files and the other. It must turn over everything under the law. And I cite Service Deli, Incorporated, 151 Fed 3rd 938, and that's a 1998 case. And I see. I have a question when we're off Brady. Was the Henthorne issue raised in the district court? I couldn't tell from your brief. The government said it wasn't. No, sir. They do dovetail into one another because Henthorne was started by a Fifth Circuit case called Deutsch. But specifically in drawing it to the attention of the district judge saying this is a different look at this question, it wasn't specifically raised? No. Well, Mr. Blanco's attorney at trial did say any employees who are being remunerated for their cooperation with the government, he raised it in a tangential fashion, I guess you would say. Well, we've got your argument in hand, and we'll give you a minute in rebuttal. Thank you very much. Thank you. May it please the Court, Your Honors. My name is Craig Demme, and I represent the U.S. Attorney's Office. Your Honor, on the issue of the informant's A file, quite candidly – Can you help me a little bit? It keeps showing up. What's an A file? Your Honor, my understanding is that if an individual has been stopped by the immigration officers with outlegal status, they will generate a file on the contact, a record entry. The person doesn't necessarily have to be convicted or formally deported or removed. But if an individual was picked up in the United States without legal status, they could be voluntarily returned. So it's a file that's compiled relevant to this person once you've got an immigration contact and the person is deemed to be here illegally? Correct, Your Honor. And Mr. Rivera has an A file. Okay. My understanding is that is true, Your Honor. And I was – quite candidly, I was not aware of that at trial. I had reviewed his confidential informant file, and things have been – have changed since then with my DEA agents finding out that an informant has a parole visa. My understanding was that at the time of trial, when it came out during the testimony of the DEA – Now, if you reviewed the confidential informant trials of DEA, but you were telling the district court that you couldn't see those files, I thought. I thought the reason that was given why you hadn't – that you could only see those files with a court order. Well, Your Honor, I was able to look at his – I guess his local file when he worked on the Blanco case, and there was nothing in there to indicate anything that was exculpatory. The prior to – But don't you have an – this is what's bothering me about this case. Don't you have an obligation – and doesn't the government have an obligation to have the prosecutor look at enough files to see whether there's anything else? The government has? Not that you have in your own hands? Well, Your Honor, the DEA wouldn't provide me with all ten of these prior cases. That's really an excuse. You work for the U.S. Attorney's Office. Yes, Your Honor. Not – you know, you don't work for a specific agency. You represent the government. And the prosecutor's obligation is to turn over documents in the government's possession. Now, it's not really much of a defense to say the DEA wouldn't give it to the U.S. Attorney because it's the government's obligation. So that doesn't get you very far. I understand, Your Honor. One of the proposals I had was telling the district court that the – absent a court order, they would not actually provide us with the file. Have you seen it yet? Have you yet seen it? Have you seen this file yet, now? Not all the other priors, no, Your Honor. So you couldn't even tell us now whether there was anything more exculpatory in there? Well, I'm basing it on the general counsels for the DEA's office that reviews the file and responds to it. I mean, he's not the lawyer in this case. You are. Correct, Your Honor. So you're taking it on somebody else's say-so that there's nothing in his files with the DEA that is exculpatory, or I'll say it this way, that can be used reasonably to impeach? At that time, yes, Your Honor. Beyond what already came out, some of it is fortuitously. Would you agree that not handing over that immigration information was a Brady violation? I don't believe so, Your Honor. Why not? Well, there was no showing that this was material information that would affect the outcome of the case. The fact the counsel brought out in front of the jury that this individual had a special parole status and had previously been illegally entered in the United States and was removed, and that he was working for the DEA. And the other thing would be exculpatory information that the person had a motive to continue to generate cases because it appeared, although we can't really tell this without the file, but it appears that there's an inference that the more – as long as he continues to generate cases, he gets to stay here? Well, that information was brought out in front of the jury. But it wasn't given by you. It came out completely fortuitously. So I'm asking you whether there was a Brady violation, meaning that you should have handed over this information and didn't. I wish I would have known about the A file beforehand. I found out on the spot. Well, I understand that. But it's your – as Judge Nelson is saying, that is something – that's an internal government problem, which you should have worked on, it seems to me. But not handing over the information that the government had about this was an error. Is that right? Your Honor, my position is, unless it was found to be material and exculpatory – Well, why wasn't it material and exculpatory for the reason I just stated? Well, Your Honor, there's not showing that there was anything that was brought out at trial that's – I mean, Brady doesn't pertain to a pretrial discovery issue. It shows that the defense had the information at trial so they could use it to – Well, they didn't have the information at trial. They fortuitously obtained it at trial, but nobody gave it to them. Correct. Is that the way Brady's supposed to work, that the government hides everything? And then if the defense is good enough to stumble across something and cross, you say, well, we didn't disclose it, but, see, it came out and crossed, so there's  I mean, is that really what Brady's supposed to accomplish? Your Honor, Brady's – my understanding is to the government's duty to disclose material exculpatory evidence that's favorable to the defense. I checked with the agents and looked at the local file on this witness, found out how much money had been paid, disclosed his prior misdemeanor shoplifting conviction. How about his INS status? I was not aware of that at the time, Your Honor. But that's certainly a major point on cross-examination, but they stumbled into  things. Is that the way you want to conduct a trial, is stumble into things? No, Your Honor. And that's why I stated to you that I make sure on that issue when we have an informant in future cases, because I didn't like learning at it, being surprised by it at trial. What else might be surprising in the DEA file that you haven't seen yet? Your Honor, the information that was requested in the discovery request, I checked into it. I think those are rhetorical questions. Your answer has to be I don't know. But that information was requested in the discovery request, wasn't it? I don't believe there was. The information about his immigration status. There was some general question about any agency, any information that any Federal agency has. There was a request in there, yes, for general agency. I don't think there was anything made for an immigration file, for an A file. Well, I mean, Henthorne has been read as a narrow case about employees. But isn't the larger point of Henthorne and of other cases that you have an – that you, the U.S. attorney, have an obligation to look at whatever files might have exculpatory information? How else can Brady operate if you don't do that? I understand, Your Honor. I see that, you know, being the duty of the prosecutor, and I can just only tell you that in that case I was surprised about the A file. I wasn't aware that there was nothing else regarding this. But you also are telling us that to this day you haven't looked at the DEA files. Well, I'm basing it on talking with my agents. I wasn't able to – the Court didn't order the DEA to turn it over or turn it over in camera for review, so. But at some point in the proceeding, either the district judge or this Court or the Supreme Court gets a government lawyer to stand up and say, I have looked at that file, and as an officer of this Court, I can tell you there is nothing in it that is exculpatory. At least we would have that. In this case, we don't have that. That's correct, Your Honor. Well, shouldn't we have that? Your Honor, the only thing I can consider would be if the Court believed that materiality is triggered just because there's a file out there, the district court could review it in camera. It's the other way around. It's that there's no way to make a materiality decision if nobody who is responsible to the Court has looked at it. When we know that there was something, and we already – with the agenda that we already know that there was something in it that was exculpatory that wasn't revealed, we already know that. The information that was revealed in trial wasn't revealed in pretrial discovery. And was not revealed to you. Correct, Your Honor. So we're not even – are we taking it on faith? I mean, on whose faith are we taking it? That there's nothing in that file today that would be exculpatory. And my, you know, going – talking through the – with the case agent that, you know, reviews the informant's file and the general counsel's office, I relied on that. The immigration file, we did a criminal history check, so there was no prior convictions for any type of unlawful removal or illegal reentry. Now, this I'm totally making up, so I don't want this to be an implication that I have any particular knowledge, because I do not. But, for example, it might turn out that in the ten other cases that Mr. Rivera has done, that in three of them he was impeached on the stand and shown to be an absolute liar. That's a possibility. The DEA may have information in his file that would tell you this. Well, the general counsel's office and the agent would, you know, disclose that to me. Similar, if they were – if I asked them – We already know that there's material they didn't disclose to you. That's what's really disturbing, which was important. Right? The immigration information. No, I didn't know about that at the time. And they did. Presumably somebody there did. I'm sorry? Somebody at the DEA knew that. Yes. So we already know that there's something that they knew that maybe because they didn't have their handles on the case, they didn't realize it would have been important. But, you know, we all agree it would have been. So they're making judgments outside the context of the case. They don't know what's going on here. Correct. And I agree on the special parole status of the immigration. I would have liked to have known that, and I did not know. Is this the usual – I mean, is this unusual that you don't get the information that is someplace in the Federal Government that could be relevant? Is that the way things usually operate? No, I don't believe so, Your Honor. In this case, like I said, I've made sure that in any informant cases that I find out if there's an immigration issue out there. In this case, I had no knowledge that – But there's not some standing understanding within the U.S. Attorney's Office that if you're going to have an informant and if he has a file somewhere in the Federal Government that you have to look at it? Well, that's why I looked at his local file. But the local file is not really the point. The question is what – if he has done things in the past and he has a track record of informing, surely it's quite possible there's something in that record that would be informative. Is there not? I think that's – that leads to speculation, that you assume that because he's worked for DEA in the past that there's going to be something in there that's going to be derogatory or exculpatory. I'm not assuming anything. I'm just asking what the government does to fulfill its obligation under Brady to turn over exculpatory information. You have to have some means of investigating. Yes, Your Honor. And I look at the file and then I try to get permission from the DEA if there's any other information. I relay, would it help you do your job if we were to state clearly in an opinion that is the obligation of the government as a whole to make available to the prosecutor in the individual case files of possible relevance so that the prosecutor in charge of the individual case may make the judgment? Perhaps, Your Honor. However, the – in this case, the district court could have ordered the DEA to disclose it. I didn't ask that question. I asked a different question. And I guess your answer is perhaps. Yes, Your Honor. Okay. But you didn't encourage the district court to do that. You basically encouraged them not to do it. No, Your Honor. I advised them that I didn't have access, absent a court order. I didn't tell them not to do it. But you also suggested that there was no need for that information. I don't believe I suggested that to the Court, Your Honor. I think I advised the Court that I didn't have access to the information. The DEA is concerned about the safety of the informant. But, of course, there was no showing about safety of the informant. And the informant was there on the stand to testify. So we're not talking about keeping secret. I was – I'm distinctly dubious on the facts of this case that safety of the informant was really at issue when the informant was up there, bold as life, testifying. Yes, Your Honor. But these prior ten cases that he's worked on that, you know, some of them were ongoing investigations, that they were concerned about, you know, disclosing that information on an absence showing that there was – I mean, that makes a lot of sense in terms of disclosing it publicly, but not within the government. And then you can make a judgment, and then you can decide what should go to the district court in Conroe and so on. But to have iron curtains within the government seems like the whole system just can't operate. It's the – the DEA has, you know, concerns about protecting their informants because of the nature of the business that they do. So they – their concern is, you know, utmost safety. And they don't want to just blanket open on every case, reveal everything about a confidential informant's prior cases. Even to the U.S. – even to the U.S. attorney. They responded to my inquiries for any type of exculpatory evidence or, you know, anything that would lead for deception or prior convictions. And they didn't tell you about this immigration issue? I didn't find out about that until – until trial. Thank you very much. Would you like a minute? Just briefly. I just wanted to point out that the very first meeting Informant Rivera had with our client, Mr. Blanco, was not supervised by the DEA. There was no body wire. There's no evidence of any meeting whatsoever having taken place on September 21st, which was supposedly the first contact. Agent Barnard freely admitted that Mr. Rivera never was drug tested. He did not know Mr. Rivera had a cell phone under a different name. The cell phone was never checked for its records. We know nothing about this man. And certainly the way the DEA handled this man, he was pretty much allowed to take drugs if he wanted to. He spent a lot of time gambling in the casinos. And when Agent Barnard asked him what he did on his off time, he said, well, I spend it with my wife up in Winnemucca. It wasn't even his wife. It was a girlfriend. So there's a lot of red flags about this man. And Mr. Blanco's trial attorney was never given an opportunity to find out if these red flags led to something that would perhaps, as one of the judges said, may have been he got he was on cases where there were acquittals. We don't know. But certainly the DEA let him pretty much run this case. And with 16, 12 to 16 agents on it, and not one of them saw anything except Mr. Rivera. That's awfully strange. Thank you very much. Thank you. The case of United States v. Blanco is now submitted for decision. The next case on the argument calendar is United States v. Owens. Thank you very much, Counsel, for your argument.
judges: T.G. Nelson, W. Fletcher, Berzon